## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY DAVID MYERS and | ) | Case No. 08-11744 |
| NANCY ANN MYERS, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| _____ | ) | |

## MEMORANDUM OPINION

This matter came before the Court on May 11, 2009 upon the Motion of Bankruptcy Administrator for Dismissal of Case Pursuant to Sections 707(b)(1) and 707(b)(3) (the "Motion to Dismiss"), filed by the United States Bankruptcy Administrator on January 27, 2009. At the hearing, Jeffrey P. Farran appeared on behalf of the above-referenced debtors (the "Debtors") and Robert E. Price, Jr. appeared on behalf of the Bankruptcy Administrator. After consideration of the Motion to Dismiss, the evidence presented at the hearing, the arguments of the parties, and the relevant law, the Court will grant the Motion to Dismiss.

## I. JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), which this Court has the jurisdiction to hear and determine.

1

## II.  FACTS

In March of 2006, the Debtors and their son moved from Florida to North Carolina.  The Debtors moved so that Mr. Myers could accept a job that had offered to him by Phoenix Land Management, Inc. ("Phoenix").  The offer from Phoenix proposed that Mr. Myers start work on March 1, 2006, but for reasons unexplained at the hearing, Phoenix later delayed the start date.

On March 13, 2006, with the offer of employment still outstanding, the Debtors closed on their current residence at 7891 Shoveler Drive, Greensboro, North Carolina.  The home has 3,209 square feet of living space, four bedrooms, and three baths; it sits on a 1.46 acre lot in a residential subdivision.  The purchase price of the house was $418,000.00.  The Debtors purchased the house with $86,000.00 of their own funds and financed the remainder with Bank of America, N.A., executing a first priority deed of trust in the bank's favor.  The Debtors' initial monthly mortgage payment, excluding taxes and insurance, was $2,085.23.  The Debtors also executed a second deed of trust securing future advances in an amount up to $60,000.00.

Shortly after closing on their house, Mr. Myers learned that Phoenix would not employ him due to a downturn in the market.  He then took a job with Harvey Wealth Management as a financial advisor.  Unfortunately, Mr. Myers was unable to make a profit in this line of work.  In May of 2006, Mr. Myers returned to his previous occupation as a part-time physical therapist with Unified Home Healthcare, which was later purchased by Advanced Home Care.  Mr. Myers worked on an "as needed" basis, earning between $31.00 and $35.00 per patient.  He earned approximately $48,000 in 2006.  Mr. Myers worked for Unified Home Healthcare/Advanced Home Care until the Debtors filed their Chapter 7 bankruptcy petition.  The Female Debtor has not been employed since seven months prior to the birth of their first child in 2005.

2

In order to supplement their income, the Debtors relied on charge cards and lines of credit. According to Schedule F, the Debtors amassed $104,335.00 in unsecured debt, $99,572.00 of which consisted of outstanding balances on ten different credit cards. On November 22, 2006, the Debtors modified their deed of trust to secure additional advances up to $85,000.00. On December 13, 2006, the Debtors obtained another modification of their home equity line, which allowed advances up to $115,000.00.

On October 27, 2008, the Debtors filed their Chapter 7 bankruptcy petition. The indebtedness on their house was $440,534.00, and they valued the house on Schedule A at $397,100.00. The Debtors' schedules reflect monthly income of $4,142.00 and expenses of $4,859.00, resulting in a deficit of $717.00. According to Schedule J, the Debtors had a $3,361.00 mortgage payment, including taxes and insurance. The Debtors also spent $428.00 in utilities[1] and $50.00 for homeowners' association dues, resulting in a total monthly housing expense of $3,839.00, which was approximately 93% of the Debtors' monthly net income. On the petition date, the Debtors owned a 2006 Infiniti M35 sedan, a 2007 Ford Expedition, and a 2003 Seafox boat. The Debtors have no retirement or savings plans for them or their children.[2]

Since November of 2008, Mr. Myers has worked for Gentiva Healthcare, earning $35.00 per patient. Also, Mr. Myers recently began working on weekends for his previous employer, Advanced Home Care, earning an additional $500.00 in monthly net income.

On January 27, 2009, the Bankruptcy Administrator filed a Motion to Dismiss based on

---

[1]Utilities include electricity and heating fuel, water and sewer, home phone, cable television, internet service, and garbage removal.

[2]The Debtors' second child was born on June 7, 2008.

3

Section 707(b)(3) of the Bankruptcy Code.  The Bankruptcy Administrator argues that the Debtors have an excessive budget, that they have an ability to repay their debts, and that they made consumer purchases far in excess of their ability to pay.

### III. DISCUSSION

The Bankruptcy Administrator seeks dismissal of the Debtors' case pursuant to Section 707(b)(3) of the Bankruptcy Code.  Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start."  Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991) (providing that Section 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, slip op. at *5 (Bankr. M.D.N.C. Sept. 21, 2001) (2001 WL 1699664) ("Section 707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while denying a head start to the abusers.").  For Section 707(b) to be applicable, the debts in the case must be primarily consumer debts, and it must be shown that granting the debtor a Chapter 7 discharge would involve an "abuse" of the provisions of Chapter 7.  It is undisputed that the debts in this case are primarily consumer debts.  The moving party, in this case the Bankruptcy Administrator, has the burden of proving abuse pursuant to Section 707.  In re Sale, No. 06-51290, slip op. at *3 (Bankr. M.D.N.C. Oct. 15, 2007) (2007 WL 3028390).

Section 707(b)(1) of the Bankruptcy Code prescribes two alternative standards to determine whether the granting of relief would be an abuse.  First, Section 707(b)(2) provides that abuse may be presumed if, under a "means test" formula, the debtors' 60-month disposable

4

income exceeds a particular threshold amount.[3]  Second, Section 707(b)(3) provides that, even if

no presumption of abuse arises, a court may still dismiss a case based upon the particular

circumstances of the case.  The Bankruptcy Administrator does not assert that the Debtors failed

the means test of Section 707(b)(2).  The Court needs only address whether there is a basis to

dismiss the case under Section 707(b)(3).

Section 707(b)(3) requires a court to consider "(A) whether the debtor filed the petition

in bad faith; or (B) [whether] the totality of the circumstances . . . of the debtor's financial

situation demonstrates abuse."  Unlike the pre-BAPCPA version, "§ 707(b)(3) does not require a

showing of 'substantial abuse,' but a lower standard of 'abuse.'"  In re Mondragon, No. 05-

10665, slip op. at *1 (Bankr. D.N.M. Aug. 24, 2007) (2007 WL 2461616); In re Mestemaker,

359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

Section "707(b)(3) incorporates a 'totality of the circumstances' standard, which courts

previously employed as the standard for determining whether to dismiss a debtor's chapter 7

proceeding based on 'substantial abuse' under pre-BAPCPA § 707(b)(2)."  Mondragon, slip op.

at *1; see Green, 934 F.2d at 572.  This Court has held that pre-BAPCPA cases, such as Green,

remain instructive in an analysis pursuant to new Section 707(b)(3).  See In re Crink, 402 B.R.

159, 170 (Bankr. M.D.N.C. 2009); In re Christiansen, No. 08-50871, slip op. at *2 (Bankr.

M.D.N.C. Jan. 21, 2009) (2009 WL 159361).  Under Green, a court is to determine whether to

dismiss a case for abuse of Chapter 7 by considering the totality of the circumstances.  Green,

---

[3]Section 707(b)(2)(A)(I) states: "In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of–(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950."

934 F.2d at 572.  The Fourth Circuit held that in considering the totality of the circumstances, a

court should consider the debtor's ability to repay his or her debts, as well as review the

following factors:

> (1)  Whether the bankruptcy petition was filed because of sudden illness,
> calamity, disability or unemployment;
> (2)  Whether the debtor incurred cash advances and made consumer purchases far
> in excess of his ability to repay;
> (3)  Whether the debtor's proposed family budget is excessive or unreasonable;
> (4)  Whether the debtor's schedules and statement of current income and expenses
> reasonably and accurately reflect the debtor's true financial condition; and
> (5)  Whether the petition was filed in good faith.

Id.  The Fourth Circuit also stated "that the majority of the cases hold that the debtor's ability to

repay is the primary factor to be considered."  Id.

### A. Excessive or Unreasonable Family Budget

Courts look to the facts of a case to determine whether debtors have an excessive or

unreasonable family budget.  The Bankruptcy Administrator asserts that the Debtors' housing

payment renders their budget unreasonable and that, given the Debtors' current income, their

house is just too expensive.  The Debtors argue that the reasonableness of their home expenses

should be measured at the time that they purchased their house and that their housing expenses

were reasonable at the time.  In support of their argument, the Debtors cite In re Vansickel, 309

B.R. 189 (Bankr. E.D. Va. 2004).  However, the Debtors' argument is misplaced.  The Vansickel

court did not analyze the reasonableness of the debtors' budgeted expenses by looking back to

the time that the expenses were first incurred.[4]  Rather, Judge Mayer analyzed the reasonableness

---

[4]In determining whether the debtors made consumer purchases in excess of their ability
to repay, the court in Vansickel used the retrospective approach that the Debtors advocate.  309
B.R. at 211.  The court stated that "[t]his factor is more properly an examination of the nature of
the debt incurred and of the debtor's reasonable expectations at the time that the obligations were

of the debtors' expenses as stated on Schedule J, which reflect the current financial condition of the debtors. Id. at 199. Judge Mayer then disallowed the debtors' current home maintenance expenses as being unreasonable. Id. This Court will take the same approach and will analyze the reasonableness of the Debtors' budget relative to the Debtor's current financial condition.

A debtor's budget may be excessive or unreasonable based on a high mortgage payment. Crink, 402 B.R. at 170; In re Rhoades, No. 08-10758, slip op. at *4 (Bankr. M.D.N.C. Jan. 21, 2009) (2009 WL 159388); In re Moreland, No. 05-10519, slip op. at *5-6 (Bankr. M.D.N.C. Aug. 3, 2005) (2005 WL 1925460); Shaw v. United States Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541 (M.D.N.C. 2004); Vansickel, 309 B.R. at 199-200.

In considering whether housing expenses are excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing. Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead. See In re Miller, 335 B.R. 335, 342 (Bankr. E.D. Pa. 2005); In re Beitzel, 333 B.R. 84, 90 (Bankr. M.D.N.C. 2005); Moreland, slip op. at *5-6.

In this case, the Debtors purchased their home in March of 2006 by borrowing approximately $340,504.66. During the next nine months, the Debtors borrowed an additional $115,466.00 on their home equity line of credit. The result is that the Debtors have no equity in the property, owing approximately $440,534.00 on a home worth $397,100.00. According to Schedule J, the Debtors' total monthly mortgage payment is $3,361.00. In addition, the Debtors' are currently spending $478.00 each month on utilities and homeowners' association dues. At the hearing, Mr. Myers testified that he recently elected to convert his fixed rate equity line of

incurred." Id.

7

credit to a variable rate, interest-only equity line, reducing the monthly payment from $851.00 to $425.00. Mr. Myers also testified that he increased his monthly net income by $500.00 with a second job. Taking into consideration the changes to the Debtors' housing expenses and income, $3,413.00 of the Debtors' monthly net income is allocated toward housing expenses, which is approximately 74% of their total monthly net income.

Despite these positive changes, the Court finds that the Debtors' housing expense is excessive. First, the Debtors have a four-bedroom, 3,209 square foot home for a family of four. The Debtors offered no reason for needing such a large amount of living space. Second, the Debtors do not have any long-standing traditional ties to their homestead, as the house was purchased in 2006. Third, there is no equity in the house. Fourth, according to IRS guidelines, housing and utilities for a family of four in Guilford County, North Carolina should be no more than $1,649.00 per month, less than half of what the Debtors are currently spending. The Debtors can find suitable housing for their family that would cost significantly less than their current home. The Court concludes that the Debtors' budget is excessive and unreasonable. This factor shows abuse.

### B. Ability to Repay

The Bankruptcy Administrator argues that if the Debtors were to obtain more affordable housing, then they would be able to repay some of their debts. An appropriate method of evaluating whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan. Crink, 402 B.R. at 172; Rhoades, slip op. at *5; Shaw, 310 B.R. at 342. The greater the ability to pay, the more likely the finding of abuse. Crink, 402 B.R. at 173; Christiansen, slip op. at *3; Rhoades, slip op. at *6;

In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000).

The Debtors' schedules indicate that they are below the applicable median family income, so the Court will evaluate the Debtors' ability to pay by considering their income and expenses as reported on their Schedules I and J. The Court must look to the Debtors' future income and expenses, as well as evaluate their financial condition at the time of filing. See Lipford, 397 B.R. at 328. According to Schedule I, the Debtors had a combined average monthly income of $4,142.00. The Debtors' Schedule J showed average monthly expenses totaling $4,859.00, resulting in monthly net income of negative $717.00. Since the petition date, Mr. Myers has increased his monthly net income by approximately $500.00 by taking on a second job. Based on this testimony, the Debtors' income monthly should be adjusted to $4,642.00.

It is also appropriate for the Court to consider whether the expenses claimed by a debtor can be reduced significantly without depriving the debtor of adequate food, clothing, shelter, or other necessities of life. In re McCain, No. 05-14382, slip op. at *3 (Bankr. M.D.N.C. June 16, 2006) (2006 WL 4458679) (citing Engskow, 247 B.R. at 317). The Bankruptcy Administrator argues that the Court should reduce the Debtors' budget to a reasonable amount, using the IRS standards as a guide. As stated above, the Debtors' housing expenses are excessive, and they could obtain alternative housing for $1,649.00 per month, resulting in an additional $1,764.00 in monthly disposable income. The Court also notes that the Debtors' Schedule J did not include the monthly secured debt payment of $512.00 on their 2006 Infiniti M35. Therefore, the Debtors' monthly expenses should be reduced to $3,181.00. After making these adjustments, the Debtors are able to pay $1,461.00 each month toward their unsecured debts, which would

provide a dividend of approximately 36% to their unsecured creditors over thirty-six months in a Chapter 13 plan.[5]  This factor shows abuse.

### C. Accuracy of Schedules

Inaccuracies on a debtor's schedules tend to show abuse.  See Lipford, 397 B.R. at 338. In this case, the only inaccuracy demonstrated by the Bankruptcy Administrator was the Debtors' characterization of their Infiniti as being leased instead of owned.  As this single inaccuracy is not material, it does not tend to show abuse.

### D. Sudden Illness, Calamity, Disability, or Unemployment

Despite their argument to the contrary, the Debtors' move to North Carolina and purchase of a home in March of 2006, only to have a job offer rescinded shortly thereafter, cannot be described as "sudden" or as a "calamity" that precipitated the Debtors' bankruptcy in October of 2008.  The Female Debtor has not worked since 2005.[6]  In spite of this fact, the Debtors' annual income increased from 2006 to 2007, and the Debtors are projected to earn even more income in 2008.  The Court finds that the Debtors did not file their bankruptcy petition due to sudden illness, calamity, disability, or unemployment.  This factor tends to show abuse.

### E.  Cash Advances and Consumer Purchases in Excess of Ability to Repay

--------

[5]The projected plan dividend is based upon unsecured debts totaling $147,769.00.  Using the value of the Debtors' house as listed on their Schedule A, a $43,434.00 deficiency would result from its sale.  As of the petition date, the Debtors owe $104,335.00 to unsecured creditors. As below-median income debtors, the Debtors' applicable commitment period in a Chapter 13 plan is not less than three years.  See 11 U.S.C. § 1325(b)(4)(A)(I).

[6]The Debtors' pleadings indicate that the Female Debtor encountered health problems stemming from the 2005 birth of their first child, which prevented her from returning to work as a registered nurse.  At the hearing, the Debtors did not argue that the Female Debtor's condition precipitated their bankruptcy filing.

10

A debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with a debtor's reasonable expectations of repayment at the time that the debt was incurred.  Beitzel, 333 B.R. at 91 (citing Vansickel, 309 B.R. at 211); Moreland, slip op. at *7.  "Taken in its proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns--all of which must be considered in light of whether a debtor is taking unfair advantage of creditors."  Beitzel, 333 B.R. at 91 (internal citations omitted).  There is no dispute that the debts in this case are primarily consumer debts, so the only issue is whether those purchases were in excess of their ability to repay.

When the Debtors purchased their home in March of 2006, neither Debtor had a current source of income.  As of the petition date, the Debtors had accumulated $104,335.00 in unsecured debts, $99,572.00 of which consisted of credit card debts.  During this period the Debtors also borrowed over $115,000.00 on lines of credit secured by their home.  In 2007, the Debtors purchased a Ford Expedition with monthly payments of approximately $800.00.  In addition, the Debtors admitted that they made purchases on credit or otherwise incurred debt in excess of their ability to repay.  In sum, the Debtors made consumer purchases at a time when they did not have the ability to repay the debt or a reasonable expectation of repayment.  These facts tend to show abuse.

**F. Good Faith**

The Bankruptcy Administrator alleges that the Debtors' decision to purchase the Infiniti three weeks prior to filing their Chapter 7 petition shows a lack of good faith.  The Debtors had previously entered into an agreement to lease the vehicle, and the decision to purchase the Infinti

11

reduced their monthly payments.  This decision does not show a lack of good faith.  The Court concludes that the Debtors filed their petition in good faith.

### IV. CONCLUSION

The standard for granting a motion to dismiss pursuant to Section 707(b)(3) is no longer "substantial abuse," but rather just "abuse."  The Debtors have an excessive budget due to their unreasonable housing expenses.  The Debtors made consumer purchases in excess of their ability to repay.  They have the ability to pay $1,461.00 per month to their unsecured creditors in a Chapter 13 plan, which would constitute a 36% dividend over three years.  The single inaccuracy on the Debtors' schedules does not tend to show abuse.  The Debtors did not file their bankruptcy due to any sudden illness, calamity, disability, or unemployment, nor did they file their petition in bad faith.  Based on the totality of the circumstances, the Court finds that allowing the Debtors to continue in a Chapter 7 would constitute an abuse of the Bankruptcy Code within the meaning of Section 707(b)(3).

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY DAVID MYERS and | ) | Case No. 08-11744 |
| NANCY ANN MYERS, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| _____ | ) | |

## <u>PARTIES IN INTEREST</u>

Gary and Nancy Myers

Jeffrey P. Farran, Esq.

Robert E. Price, Jr., Bankruptcy Administrator

Everett B. Saslow, Jr., Chapter 7 Trustee